******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JULIE M. SOWELL *v.* DEIRDRE H. DICARA ET AL.
(AC 36921)

Lavine, Prescott and Elgo, Js.

*Argued May 12—officially released November 10, 2015*

(Appeal from Superior Court, judicial district of Waterbury, Hon. Barbara J. Sheedy, judge trial referee.)

*George E. Mendillo*, self-represented, the plaintiff in error.

*Jeffrey J. Tinley*, with whom, on the brief, was *Amita P. Rossetti*, for the defendants in error (named defendant et al.).

*Opinion*

LAVINE, J. This case comes before this court on a writ of error brought by the plaintiff in error, George E. Mendillo, attorney for the plaintiff, Julie M. Sowell. In his writ of error, Mendillo alleges that, during the course of a hearing on an emergency motion for protective order (motion for protective order), the trial court, *Hon. Barbara J. Sheedy*, judge trial referee, (1) improperly found that he had violated rule 4.2 of the Rules of Professional Conduct as there was no clear and convincing evidence to warrant such a finding, (2) violated his state and federal constitutional rights to due process, and (3) abused its discretion by refusing to let him present testimonial and documentary evidence at the hearing on the motion for protective order.[1] We dismiss the writ of error.

The record discloses the following uncontested facts. The underlying wrongful discharge action (*Sowell* action) was commenced in the summer of 2012. Sowell filed a revised complaint on August 30, 2013, alleging, in relevant part, that she was a licensed marriage and family therapist who had been employed by the defendant Southbury-Middlebury Youth and Family Services (agency) to provide mental health services to students and youth in the defendant Region 15 School District (Region 15). The revised complaint also alleged that the defendant Deirdre H. DiCara was the executive director of the agency, and the defendant Mary Jane McClay is the chairperson of the agency's board of directors.[2]

Sowell further alleged that the agency hired her as a counselor in 1997, and that she became the agency's clinical director in 2006. Beginning in 2010, disputes about the agency's management arose between Sowell and DiCara and McClay. Sowell alleged that in late 2011, she reported to the superintendent and members of the Region 15 board of education her suspicions that the agency had violated state laws and regulations. She also alleged that DiCara and McClay created a hostile work environment, and that she experienced severe hypertension requiring her to take a medical leave of absence in early 2012. By letter dated February 21, 2012, Sowell notified the agency that she intended to resign her position as clinical director effective June 30, 2012. On February 25, 2012, Sowell received a letter from the agency terminating her employment effective immediately. Sowell alleged that DiCara and McClay conspired to terminate her employment due to her physical disability and the fact that she had disclosed the agency's violations of law. Sowell's twenty-one count revised complaint alleged various torts, breaches of contract, and statutory violations against each of the defendants and Region 15.

On October 30, 2013, the defendants filed an answer

denying the material allegations of the revised complaint and alleged special defenses. The agency also alleged a breach of contract counterclaim that, on information and belief, claimed that on dates when Sowell reported that she was too ill to work at the agency, she engaged in her private counseling practice and was compensated by her private clients for her services. Moreover, Sowell failed to inform the agency that she had engaged in private practice while she was on paid sick leave thereby breaching the covenant of good faith and fair dealing, her duty of loyalty, and her duty of honest and faithful service as an employee of the agency. The agency alleged damages.

On December 5, 2013, the agency filed the motion for protective order in which it stated that it was seeking "an emergency hearing and protective order to permanently enjoin . . . Mendillo, from having any further contact of any kind with members of the Board of Directors of [the agency] without prior permission of counsel." In the memorandum of law accompanying the motion for protective order, the agency represented that, at all times relevant, the defendants were and are represented by an attorney, Jeffrey J. Tinley, of the law firm of Tinley, Nastri, Renehan & Dost, LLP (Tinley firm).[3]

The memorandum of law in support of the motion set forth the following facts. On December 2, 2013, Tinley received a letter signed by Mendillo that was dated November 29, 2013.[4] Attached to that letter were copies of a claim letter that Mendillo had sent directly to members of the agency's board of directors,[5] but not to DiCara and McClay. In the claim letter, Mendillo suggested that counsel for the agency had filed the counterclaim without authority and that the board members could be individually liable to Sowell. The memorandum of law described the content of the claim letter[6] and set forth the pertinent portion of article IV of the agency's bylaws.[7] The memorandum represented that during discovery, the defendants had provided Mendillo with a copy of the agency's bylaws. Moreover, it represented that Mendillo never obtained Tinley's permission to communicate directly with the board of directors.

The memorandum of law identified the defendants and Region 15. It set forth Sowell's employment history with the agency and that she is Mendillo's sister. It also described Sowell's cause of action against the defendants and stated that the agency had been dissolved on December 27, 2012, and was in the process of winding up its affairs.

As to the applicable law, the memorandum of law cited rule 4.2 of the Rules of Professional Conduct, which provides in relevant part: "In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to

be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so. . . ." The agency added that the purpose of rule 4.2 "is to preserve the integrity of the lawyer-client relationship by protecting the represented party from the superior knowledge and skill of the opposing lawyer. The rule is to prevent situations in which a represented party may be taken advantage of by opposing counsel." *Pinsky* v. *Statewide Grievance Committee*, 216 Conn. 228, 236, 578 A.2d 1075 (1990).

The agency argued that when the client is an organization, those individuals who have managerial responsibility fall within the definition of a client as the term is used in rule 4.2, citing specific language in the official commentary to rule 4.2.[8] It contended that Mendillo knowingly and wilfully violated rule 4.2 because he knew that the agency was represented by counsel as he had a copy of the agency's bylaws that state that the board of directors manages the agency's business. The agency argued that because Mendillo communicated directly with the members of the board of directors and knowingly requested that they authorize the withdrawal of the agency's counterclaim against Sowell, he had violated rule 4.2.

The agency also cited rule 2.15 of the Code of Judicial Conduct, in support of its motion for a protective order. Rule 2.15 (d) provides: "A judge who receives information indicating a substantial likelihood that a lawyer has committed a violation of the Rules of Professional Conduct shall take appropriate action." See *Bergeron* v. *Mackler*, 225 Conn. 391, 397, 623 A.2d 489 (1993) (court has authority to regulate conduct of attorneys and duty to enforce standards regarding their conduct). The memorandum of law concluded that, given Mendillo's direct communication with the board of directors regarding the merits of the agency's counterclaim against Sowell for the purpose of influencing their decision to withdraw it, the agency was entitled to a protective order prohibiting Mendillo from having further unauthorized communication with the board of directors. Significantly, the agency requested only that its motion for protective order be granted; *it did not ask the court to sanction Mendillo for communicating with the board of directors.*

Sowell filed an objection to the agency's motion for a protective order. In it, she argued that the agency was a dissolved nonprofit nonstock corporation and that the counterclaim was filed without the knowledge or consent of the board of directors. Although Tinley represented the defendants, Sowell argued, he did not represent the board of directors in their individual capacities. She relied on rule 1.13 of the Rules of Professional Conduct to support her argument.

Sowell also argued in her written objection that the board of directors had not authorized Tinley to repre-

sent the agency in the *Sowell* action or to file the counterclaim, which contained false and libelous allegations. In support of her arguments, Sowell relied on portions of McClay's deposition at which McClay testified that she had not communicated with the board of directors since the board last held a meeting in July, 2012.[9] Sowell, therefore, argued that McClay lacked authority to represent the agency in the *Sowell* action. Moreover, Sowell argued that a conflict of interest existed between McClay and the board of directors because McClay is a defendant in the *Sowell* action. In conclusion, Sowell argued that unless Tinley could establish that he was retained to represent the agency by a person who had corporate authority to do so, he lacked standing to proceed with the agency's motion for a protective order. *Sowell contended that the only issue with regard to the protective order "is whether the notice claim letter sent by [Mendillo] to individual members of the [agency's] board of directors, advising them that they will be held personally liable to [her] if the counterclaim filed by [the agency] is not withdrawn, is prohibited by rule 4.2 of the Rules of Professional Conduct."* (Emphasis added.) Moreover, Sowell represented that Mendillo would not communicate with members of the board of directors without a court order or Tinley's consent.

Sowell also argued that the motion for protective order was improper and unnecessary on the grounds that the agency was a dissolved corporation and that McClay is the only member of the board of directors who has been actively engaged in the winding up of the agency's affairs. In addition, Sowell claimed that McClay has a material financial interest in the outcome of the *Sowell* action and that she did not have the authority to retain Tinley. Also, Sowell argued that Tinley owed a duty to the agency and the individual members of the board of directors to explain that the counterclaim constituted an abuse of process that was likely to result in substantial injury to the agency and might reasonably be imputed to the individual directors. In support of her argument, Sowell relied on rule 1.13 (a), (b), (f), and (g) of the Rules of Professional Conduct.[10] Sowell asserted that Tinley had not met with the board of directors to obtain their informed consent to allege the counterclaim, as he was required to do. Sowell was of the opinion that the individual members of the board of directors were not Tinley's clients and, therefore, it was not improper for Mendillo to communicate with them. For the foregoing reasons, Sowell asked that the motion for protective order be denied.

Mendillo, Tinley, and Attorney John Majewski of the Tinley firm appeared before the court on December 12, 2013, to present argument on the agency's motion for protective order. The court stated that it had read the motion for protective order and would hear from the parties. When the proceeding commenced, Majewski

inquired whether the court needed argument. The court responded, "no." Majewski reminded the court that the defendants were not seeking sanctions, which the court stated it understood.

The court then turned to Mendillo, and the following colloquy transpired.

"Attorney Mendillo: Your Honor, the representations that were made in my objection concerning . . . McClay's statements at deposition have, in fact, been verified. I do have a transcript—a full transcript of her deposition testimony given on November 25. I think her testimony is directly material to the issue of whether or not it was appropriate to send the notice of claim letter to the individuals. And . . . McClay is here to testify, and I would ask that she do so.

"The Court: *Do you think that's necessary? Do you think the court cannot rule on this motion without having heard from . . . McClay having read your motions and representations?*

"Attorney Mendillo: My only issue, Your Honor, is based on the information available to me at the time the objection was filed. There was no legal authority for . . . Tinley. *You've read the objection.* There was no legal authority for . . . Tinley to be representing [the agency] in this matter, and therefore, I don't think he has standing.

"The Court: Well, that's not before the court today, first of all. That's not part of this issue. Here is the issue . . . . Let's pretend, sir, that you were representing me in a lawsuit. And along comes . . . Tinley who's defending that case. And he writes a letter not only to you as my lawyer, but to whatever other parties there were in the litigation. Tell me . . . if you think that's appropriate, sir? Be honest.

"Attorney Mendillo: Well, Your Honor, based on the fact scenario that you presented, I would say no but I think that . . . .

"The Court: But there isn't a different law for different fact scenarios. . . . Here is the thing. When you write to opposing counsel—and I understand you sent a copy of it to . . . Tinley, I believe; correct?

"Attorney Mendillo: Yes.

"The Court: But you were also generous enough, sir, to send a copy to all of the people that they represented, okay. And whether you intended it or not . . . the letter was such that you struck out. And to tell . . . Tinley's clients your view of the law as it applied to them, number one, that's not proper, sir. They hired him. And whether you would be a better choice, is beyond the pale, because he's their lawyer. So, for you to send a copy of the letter to . . . Tinley and to each of his clients at the same time and proceed to tell them what the law is, and to present a kind of veiled threat of

what will happen is just not appropriate . . . . And I know enough about you, sir, to know that you didn't intend any of these consequences, but it doesn't alter the fact that you are communicating with his clients.

"Attorney Mendillo: Your Honor, if I may . . . . The issue under rule 4.2, number one, is whether or not this is the transaction, the same transaction. And the transaction that . . . Tinley's firm represents [the agency] is the defense of a wrongful discharge claim. Now, [the agency] closed in August, 2012, and was dissolved in December, 2012. And the claims which were asserted in the notice letter that I filed have nothing to do with the wrongful discharge claim. They . . . pertain to causes of action which have arisen since the wrongful discharge. And I think that . . . is the principal issue for the court to focus on.

"The Court: No, sir. The principal issue for the court to focus on is what is proscribed by rule 4.2 of the Connecticut Rules of Professional Conduct. And I specifically refer to the language that says, 'when representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter unless the lawyer has the consent of the other lawyer or is authorized to do so.'

"It doesn't make any difference, sir, which cause of action you want to focus on . . . . What matters is that these people were . . . Tinley's clients, and sending them a copy of your letter at the same time that you . . . provided a copy to . . . Tinley, doesn't make it right, sir. That's what the rule reads. It doesn't say anything about representing on a prior claim or representation on a different cause of action. It doesn't care. You can't communicate with his clients without his express consent and permission, and we know that wasn't done.

"No sanctions . . . are asked here. And that is the way, I think, frankly, I think one counsel should treat another. But that is the court's clear view and that is that there was a violation of that rule of conduct.

"Attorney Mendillo: Your Honor, because I do take my professional responsibilities extremely seriously . . .

"The Court: I believe that.

"Attorney Mendillo: I would like to, with the court's permission, to make a record because I have researched.

"The Court: *You can make a record. I read, by the way, your objection. So if you are going to tell me what you said in the objection, please don't.*

"Attorney Mendillo: No.

"The Court: Because that will be a matter of record.

"Attorney Mendillo: No. It's the underlying facts that I would like to make a record of because I wasn't in a position to do so in the objection.

"The Court: Go right ahead.

"Attorney Majewski: Oh, no, no, no. He wants testimony.

"The Court: No. Tell me what the testimony would show, sir.

"Attorney Mendillo: *The testimony will show, Your Honor, that there has been no communication between . . . McClay, who is the chairman of the* [*agency*] *board and the others on the board.*

"The Court: *I know. I read the papers. I really was telling the truth when I said I read it.*

\* \* \*

"Attorney Mendillo: But, it's exceedingly important to me that the underlying facts are viewed here because I think that they have to be looked at in order to make an informed decision about 4.2.

"The Court: *Before I answer that question, sir, would you agree with me that it is an underlying fact that you sent to . . . McClay a communication, to . . . Tinley at the same time you sent a copy of the same letter to his clients; is that true?*

"Attorney Mendillo: *Yes, it is, Your Honor. . . .*

"The Court: *Is it also true that you did that without permission from . . . Tinley?*

"Attorney Mendillo: *Yes.* But I do not stipulate to, number one, Your Honor, that they were his clients.

"The Court: We are by number one. We are on number two.

"Attorney Mendillo: Well, I misspoke when I said yes to number one. I do not stipulate that they were . . . Tinley's client at that time. They may be at the present time, but only if they've been retained.

"The Court: Well, were they at the time you sent the letter to them?

"Attorney Mendillo: No, they were not.

"The Court: Well, then, what I'm going to say to you, sir, is if you are right in that, then what continues to be true, is that you are sending the letter to . . . Tinley and his then purported clients, creates the semblance of a violation of rule 4.2 of the Rules of Professional Conduct.

"Attorney Mendillo: Your Honor, if I may? In my view, I had an ethical obligation under the rules of professional responsibility to send those notice letters to the individual board members because if I had filed a law-

suit against them without notifying them . . . .

"The Court: You are putting yourself in a position you were not in, sir. That's what . . . Tinley's to worry about, not you. That's his problem if it's a problem at all, sir. It's not your job . . . to put yourself in the position of . . . Tinley and say he shouldn't have done it. We are talking about what you did, sir, because what's before the court today is whether you, under the Rules of Professional Conduct, had a clear right to send . . . Tinley a letter at the same time—here's the offensive part—at the same time you sent the same letter to his clients. And even if there was just one of those clients, that is a violation of the Rule of Professional Conduct 4.2. I believe you don't believe that, but that doesn't mean you are right, sir." (Emphasis added.)

At the conclusion of the proceeding, the court stated: "Rule 4.2 doesn't say anything about the truth of the matters to have been commented on. It simply says you cannot communicate with the clients of adverse . . . lawyers without the permission of that lawyer. True? Untrue? Partly true? Partly untrue? Makes no difference. You don't communicate with them. And when the communication veers off into areas that can be perceived as threatening, it's just too far . . . . You may not have intended it, sir, I don't believe you did, but I think you need to look more closely at the language that is used before you run off again. It's clear to me that you did what you shouldn't have done. *Counsel has been kind enough to say, we are not seeking sanctions.* I don't know whether I would have entered them or not, but he makes my job easier when he says I'm not seeking it. But *the emergency motion for protective order is granted,* enthusiastically." (Emphasis added.)

Thereafter, on December 31, 2013, Mendillo filed a petition for a writ of error in our Supreme Court, which transferred the petition to this court. See Practice Book § 65-1. In his petition for a writ of error, Mendillo alleged that the trial court exceeded its discretion during the proceeding on the motion for protective order by refusing to hear testimony from a lay witness and that the court violated both the federal and state constitutions in refusing to receive the proffer of documentary evidence that, according to Mendillo, the Tinley firm was not authorized to represent the agency in the *Sowell* action. Mendillo seeks to have the finding that he violated rule 4.2 of the Rules of Professional Conduct set aside.[11]

In his brief to this court, Mendillo claims that (1) the evidence in the record does not support the court's findings of fact, (2) the court's conclusion that he violated rule 4.2 of the Rules of Professional Conduct is legally and logically incorrect, (3) the court denied him due process of law, and (4) the court abused its discretion by failing to permit him to present testimony and place a document into evidence. We disagree with each of Mendillo's claims and, therefore, dismiss the writ

of error.

Pursuant to the rules of practice, writs of error in matters of law may be brought from a final judgment of the Superior Court to the Supreme Court. Practice Book § 72-1 (a); accord General Statutes § 52-572; *State* v. *Salmon*, 250 Conn. 147, 150, 735 A.2d 333 (1999). A writ of error, therefore, necessarily presents a question of law. When the "trial court draws conclusions of law, our review is plenary and [an appellate court] must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *MSO, LLC* v. *DeSimone*, 313 Conn. 54, 62, 94 A.3d 1189 (2014).

## I

Before we address the merits of Mendillo's writ of error, we first must decide whether we have jurisdiction to consider it. The defendants claim that this court lacks subject matter jurisdiction because Mendillo was not aggrieved when the court granted the motion for protective order, and therefore, he lacks standing to bring a writ of error. We disagree.

"Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless [one] has, in an individual or representative capacity, some real interest in the cause of action . . . . Standing is established by showing that the party claiming it is authorized by statute to bring suit or is classically aggrieved. . . . The fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as the concern of all the members of the community as a whole. Second, the party claiming aggrievement must successfully establish that the specific personal and legal interest has been specially and injuriously affected by the decision. . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Internal quotation marks omitted.) *Gold* v. *Rowland*, 296 Conn. 186, 207, 994 A.2d 106 (2010).

In the present case, Mendillo petitioned for a writ of error after the court granted the agency's motion for a protective order. At the time the parties appeared before the court to argue the agency's motion for protective order, counsel for the agency stated that it was not seeking sanctions against Mendillo. The court stated that it understood that the agency was not seeking sanctions and would not impose sanctions pursuant to that representation. In this court, the defendants contend that because the court did not sanction Mendillo, he has not been aggrieved. We disagree with the

defendants because we conclude that the court's finding that Mendillo violated rule 4.2 is sufficient to establish aggrievement.

"It is settled law in Connecticut that a sanction for professional misconduct adversely affects an attorney's vested right to practice law." *Briggs* v. *McWeeny*, 260 Conn. 296, 312, 796 A.2d 516 (2002). Standing alone, a judicial finding that an attorney violated the Rules of Professional Conduct constitutes a disciplinary sanction tantamount to a reprimand, even when the finding was not made in the context of a formal grievance proceeding. See *State* v. *Perez*, 276 Conn. 285, 298–300, 88 A.2d 178 (2005). An attorney has standing to seek appellate review of a judicial determination that he has committed an ethical violation, notwithstanding the fact that no sanction was imposed, because that determination reflects adversely on an attorney's professional reputation. Id., 299.

Following oral argument before this court, we carefully reviewed the transcript of the hearing on the agency's motion for protective order as well as the entire record in the *Sowell* case. We found it ambiguous as to whether the court had found that Mendillo had violated the Rules of Professional Conduct, and if so, by what burden of proof.[12] Whether the court found that Mendillo violated one of the Rules of Professional Conduct is central to whether he has been aggrieved. See *State* v. *Perez*, supra, 276 Conn. 298–300. We, therefore, sua sponte ordered the trial court to articulate "whether it affirmatively found on December 12, 2013, that . . . Mendillo violated rule 4.2 of the Rules of Professional Conduct. If the answer to that question is yes, the trial court is ordered to articulate whether it so found by clear and convincing evidence."

The trial court articulated that it found that Mendillo violated rule 4.2 of the Rules of Professional Conduct by sending a notice of claim letter related to the *Sowell* action to persons who were represented by counsel. The court stated that it made the finding by clear and convincing evidence.

On the basis of the full record, the court's articulation, and the law, we conclude that because the court found that Mendillo violated rule 4.2 of the Rules of Professional Conduct, he is aggrieved and has standing to bring a writ of error. This court, therefore, has jurisdiction to adjudicate it. We now turn to the merits of the writ of error.

II

Mendillo's first claim is that the facts found by the court are not supported by clear and convincing evidence. We do not agree.[13]

The Superior Court has inherent authority to compel the observance of its rules. See *Fattibene* v. *Kealey*, 18 Conn. App. 344, 359, 558 A.2d 677 (1989). In matters

concerning review of the decisions of the trial court regarding violations of the Rules of Professional Conduct, our role is to determine if the facts as found are supported by the evidence contained in the record and whether the conclusions that follow are legally and logically correct. See *Ansell* v. *Statewide Grievance Committee*, 87 Conn. App. 376, 382–83, 865 A.2d 1215 (2005).

"[I]n a matter involving attorney discipline, no sanction may be imposed unless a violation of the Rules of Professional Conduct has been established by clear and convincing evidence. . . . [C]lear and convincing proof denotes a degree of belief that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. . . . [The burden] is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Citation omitted; internal quotation marks omitted.) *State* v. *Perez*, supra, 276 Conn. 307–308.

In the present case "our role is limited to reviewing the record to determine if the facts as found are supported by the evidence contained within the record and whether the conclusions that follow are legally and logically correct." (Internal quotation marks omitted.) *Lewis* v. *Statewide Grievance Committee*, 235 Conn. 693, 698, 669 A.2d 1202 (1996).

In its articulation as ordered by this court, the trial court stated: "On December 12, 2013, I did affirmatively find—by clear and convincing evidence—that . . . Mendillo violated rule 4.2 of the Rules of Professional Conduct. On that date I heard argument on defense counsel's emergency motion for protective order and objection thereto. The conduct in question was . . . Mendillo's forwarding to defendants (represented by counsel) a notice of claim letter in which he stated his view of the applicable law and what he believed would be the legal consequences of their dismissal of his sister's employment by [the agency] . . . . Rule 4.2 of this state's Rules of Professional Conduct prohibits a lawyer from communicating with a party he knows to be represented without the prior consent of that lawyer. No such consent had been given . . . Mendillo and, thus, the impropriety of that communication. At the hearing on December 12, 2013 . . . Mendillo acknowledged the communication with defendants without the prior knowledge or consent of their counsel. I found that communication was clear and convincing evidence of the violation of rule 4.2, which violation assaulted the integrity of the lawyer-client relationship to which defense counsel was entitled."

When the agency filed its motion for protective order,

it attached a copy of the letter Mendillo sent to Tinley and copies of the letter Mendillo sent to members of the board of directors. See footnotes 4 and 5 of this opinion. Mendillo's letter to Tinley indicated that Mendillo had sent a claim letter to each member of the board of directors and that the letter concerned the *Sowell* action. The claim letter sent to the board of directors concerned the *Sowell* action and Mendillo's legal opinion of the agency's counterclaim against Sowell and threatened individual liability of the members of the board of directors. In the trial court and before us, Mendillo does not contend that the letters attached to the agency's motion for protective order were anything other than accurate copies of the letters that he sent to Tinley and the board of directors. Moreover, during his colloquy with the trial court, as previously noted, Mendillo admitted that he sent the claim letter to the board of directors and that he did so without Tinley's permission.[14]

On the basis of the letters attached to the agency's motion for protective order and Mendillo's admission before the court that he sent the claim letter to the board of directors, and in light of the trial court's articulation, we conclude that there was clear and convincing evidence before the court that Mendillo violated rule 4.2 by communicating with Tinley's clients without his permission.

There is no dispute as to the underlying facts. The issue is a legal question, i.e., whether the members of the agency's board of directors were Tinley's clients. Here, as in the trial court, Mendillo's argument that the members of the board of directors were not Tinley's clients begins with rule 1.13 (a) of the Rules of Professional Conduct, which provides that "[a] lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents." Mendillo contends that because the agency had been dissolved, was in the process of winding down and that the board had not met to authorize McClay to retain the Tinley firm and had not ratified the filing of a counterclaim against Sowell at the time of the hearing on the motion for protective order, the members of the board were not Tinley's clients at the time Mendillo sent them the subject letters. Mendillo's argument is not legally or logically correct.

Rule 1.13 (a) provides that a lawyer "retained by an organization represents the organization acting through its duly authorized constituents." The commentary to rule 1.13 of the Rules of Professional Conduct states in relevant part: "An organizational client is a legal entity, but it cannot act except through its officers, directors, employees, shareholders and other constituents. Officers, directors, employees and shareholders are the constituents of the corporate organizational client."

In the underlying *Sowell* action, the Tinley firm filed an appearance on behalf of DiCara, McClay, *and* the agency. The trial court may take judicial notice of the file. See *Wasson* v. *Wasson*, 91 Conn. App. 149, 151 n.1, 881 A.2d 356, cert. denied, 276 Conn. 932, 890 A.2d 574 (2005).

The agency's bylaws, which were disclosed during discovery, state in relevant part: "3. Powers, Responsibilities and Accountabilities. The corporate business affairs of the corporation shall be managed under the director of the Board of Directors, except as may be otherwise provided in these Bylaws or the articles of incorporation." The agency's bylaws indicate that its business affairs are managed by the board of directors. The Tinley firm was retained to represent the agency; pursuant to rule 1.13, the members of the board of directors are constituents of Tinley's corporate client.

The commentary to rule 4.2 states in relevant part: "In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for the purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization." The copies of the letters Mendillo sent to the board of directors were before the court and Mendillo admitted to the court that he sent the letters to the members of the agency's board of directors. We therefore conclude that there was clear and convincing evidence to support the court's finding that Mendillo violated rule 4.2 by sending the letters to the board of directors.

Mendillo's argument that the board of directors had not authorized McClay to retain Tinley nor ratify her act of retaining Tinley prior to the time he sent the claim letter misconstrues the law of agency.[15] "Ratification means the adoption by a person, as binding upon himself, of an act done in such relations that he may claim it as done for his benefit, although done under such circumstances as would not bind him except for his subsequent assent; as where an act was done by a stranger having at the time no authority to act as his agent, or by an agent not having adequate authority. The acceptance of the results of the act with an intent to ratify, with full knowledge of all the material circumstances, is a ratification. Ratification makes the contract in all respects what it would have been if the requisite power had existed when it was entered into. It relates back to the execution of the contract and renders it obligatory from the outset." *Ansonia* v. *Cooper*, 64 Conn. 536, 544, 30 A. 760 (1894). In other words, the board of directors could not have ratified McClay's acts unless she had authority to act in the first place.

Mendillo's argument that because the agency had been dissolved and was in the process of winding up, McClay was deprived of her authority to retain Tinley is unpersuasive. General Statutes § 33-884 (a) provides in relevant part: "A dissolved corporation continues its corporate existence but may not carry on any business except that appropriate to wind up and liquidate its business and affairs . . . ." "Implicit in such authority is the ability to settle or otherwise be subject to litigation to resolve outstanding obligations." *Single Source, Inc.* v. *Central Regional Tourism District, Inc.*, 312 Conn. 374, 391, 93 A.3d 1065 (2014). For this reason, Mendillo's argument that McClay lacked authority to retain Tinley due to the agency's dissolution is of no avail.

For the foregoing reasons, we conclude that the court's legal conclusion that Mendillo violated rule 4.2 is supported by clear and convincing evidence in the record.

### III

Mendillo next claims that the court denied him the right to due process by denying him an evidentiary hearing. We disagree.

"It is well established that [j]udges of the Superior Court possess the inherent authority to regulate attorney conduct and to discipline the members of the bar. . . . It is their unique position as officers and commissioners of the court . . . which casts attorneys in a special relationship with the judiciary and subjects them to its discipline. . . . It is also well established that a sanction for professional misconduct adversely affects an attorney's vested right to practice law. . . . Thus, attorneys subject to disciplinary proceedings are entitled to due process of law." (Citation omitted; internal quotation marks omitted.) *State* v. *Perez*, supra, 276 Conn. 296. "As a procedural matter, before imposing any . . . sanctions [on an attorney], the court must afford the . . . attorney a proper hearing . . . . There must be fair notice and an opportunity for a hearing on the record." (Internal quotation marks omitted.) Id., 296–97.

"In attorney disciplinary proceedings, two interests are of paramount importance. One the one hand, we must not tie the hands of . . . courts with procedural requirements so strict that it becomes virtually impossible to discipline an attorney for any but the most obvious, egregious and public misconduct. On the other hand, we must ensure that attorneys subject to disciplinary action are afforded the full measure of procedural due process required under the constitution so that we do not unjustly deprive them of their reputation and livelihood. . . .

"To satisfy the requirements of due process, attorneys subject to disciplinary action must receive notice

of the charges against them. In the context of attorney misconduct proceedings, this court previously has stated that notice must be sufficiently intelligible and informing to advise the . . . attorney of the accusation or accusations made against [him], to the end that . . . [he] may prepare to meet the charges against [him] . . . . If this condition is satisfied, so that the accused is fully and fairly apprised of the charge or charges made, the complaint is sufficient to give [him] an opportunity to be fully and fairly heard . . . ." (Citation omitted; internal quotation marks omitted.) Id., 297.

We are cognizant that the United States Supreme Court has stated that "due process, unlike some legal rules, is not a technical concept with fixed content unrelated to time, place and circumstances. . . . [D]ue process is flexible and calls for such procedural protections as the particular situation demands." (Citation omitted; internal quotation marks omitted.) *Gilbert* v. *Homar*, 520 U.S. 924, 929, 117 S. Ct. 1807, 138 L. Ed. 2d 120 (1997); see also *Commissioner of Environmental Protection* v. *Farricielli*, 307 Conn. 787, 820, 59 A.3d 789 (2013) (no per se rule that evidentiary hearing required whenever property interest may be affected); *Henderson* v. *Lagoudis*, 148 Conn. App. 330, 341–42, 85 A.3d 53 (2014) (due process does not mandate full evidentiary hearing on all matters; not all situations calling for procedural safeguards call for same kind of procedure).

Mendillo's due process claim is predicated on the court's refusing to permit him to call McClay to testify or to put a copy of her deposition testimony into evidence. Mendillo proffered to the court that the proposed testimony was necessary to substantiate the representations he had made in Sowell's objection to the motion for protective order. That evidence, however, was not in dispute. The parties did not then, and do not now, dispute those facts. The court accepted Mendillo's understanding of the facts and the law, and his belief that the members of the board of directors were not Tinley's clients. The court stated that it had read the motion for protective order and Sowell's objection. The court recognized, however, that an evidentiary hearing would serve no purpose because the issue before it was not a question of fact, but an issue of law. In essence, therefore, Mendillo had a hearing at which he was able to create a record and tell his side of the story. See *AFSCME, Council 4, Local 2663* v. *Dept. of Children & Families*, 317 Conn. 238, 259,    A.3d    (2015).

The legal issue before the trial court, and before us, is whether Tinley's appearance on behalf of the defendants, including the agency, precluded Mendillo from sending the notice of claim letter to the agency's board of directors. In part II of this opinion, we considered and rejected Mendillo's claim that the court improperly concluded that he violated rule 4.2 as a matter of law. As the record before us discloses, Mendillo had an

opportunity to argue his position before the trial court and to create a record. We conclude, therefore, that the trial court did not deny Mendillo his constitutional rights to due process of law.

IV

Mendillo's final claim is that the court abused its discretion as to the admission of evidence by failing to let him present testimony and place a document into evidence. We disagree.

The parties appeared before the court so that the court could determine whether a motion to prohibit Mendillo from communicating with the agency's board of directors should be granted. The court had familiarized itself with the motion for protective order and Sowell's objection. Mendillo sought to have McClay testify because in his opinion, "her testimony is directly material to the issue of whether or not it was appropriate to send the notice of claim letter to the individuals." The court asked why it could not rule on the bases of the parties' representations in their memoranda of law. Mendillo stated that his only issue "is based on information available to me at the time the objection was filed." Mendillo claimed that there was no legal authority for Tinley to be representing the agency in the counterclaim.

"[M]atters involving judicial economy, docket management [and control of] courtroom proceedings . . . are particularly within the province of a trial court." (Internal quotation marks omitted.) *Marshall* v. *Marshall*, 71 Conn. App. 565, 574, 803 A.2d 919, cert. denied, 261 Conn. 941, 808 A.2d 1132 (2002). Connecticut trial judges have "inherent discretionary powers to control proceedings, exclude evidence, and prevent occurrences that might unnecessarily prejudice the right of any party to a fair trial. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Gilmore*, 289 Conn. 88, 128, 956 A.2d 1145 (2008).

As we previously concluded in part III of this opinion, the parties agreed on the underlying facts and the court made clear that it had familiarized itself with the motion for protective order, the objection thereto, and the parties' memoranda of law. The court accepted as true Mendillo's proffer of proof. Neither the testimony, nor the deposition transcript, would have materially aided the court in reaching its decision. We conclude, therefore, that the court did not abuse its discretion by denying Mendillo's request to present evidence.

The writ of error is dismissed.

In this opinion the other judges concurred.

[1] In his brief to this court, but not alleged in his writ of error, Mendillo contends that "there is a substantial likelihood that the [defendants' counsel]

has committed violations of the Rules of Professional Conduct." We decline to address the claim as it is not properly before us. As Mendillo himself correctly points out, before a sanction for a violation of the Rules of Professional Conduct may be imposed, an attorney must be given fair notice and an opportunity for a hearing. See *CFM of Connecticut, Inc.* v. *Chowdhury*, 239 Conn. 375, 393, 685 A.2d 1108 (1996), overruled in part on other grounds, *State* v. *Salmon*, 250 Conn. 147, 154–55, 735 A.2d 333 (1999) (en banc).

Mendillo also asks that this court vacate the order granting the motion for protective order. Although the writ of error arises from the underlying *Sowell* action, the *Sowell* action itself is not before us. The propriety of the protective order, therefore, is not properly before us.

[2] In this opinion, we refer to DiCara, McClay, and the agency as the defendants and to Region 15 School District as Region 15.

[3] The record discloses that on September 6, 2012, the Tinley firm filed an appearance on behalf of the defendants. Attorney Jeffrey J. Tinley signed the appearance form and certified that a copy of the appearance was mailed or delivered electronically to Mendillo and to Shipman & Goodwin, LLP, counsel for Region 15.

The Tinley firm is now known as Tinley, Renehan & Dost, LLP.

[4] Mendillo's letter to Tinley stated: "On October 30, 2013, [the agency] filed a Counterclaim against [Sowell] in the captioned action. At deposition on November 25, 2013 . . . McClay, Chairman of the [agency] Board of Directors, testified that she authorized you to file the Counterclaim without authorization by the [agency] Board of Directors. Indeed, McClay testified that there has been no meeting of the [agency] Board of Directors since July 2012.

"McClay had no legal authority to authorize you to file that Counterclaim. Beyond that, the assertions contained in the Counterclaim are false and libelous and made with malice. The Counterclaim was filed to accomplish an unlawful purpose and is an unlawful abuse of process. [Sowell] has made demand for withdrawal of the Counterclaim to each member of the [agency] Board of Directors. Copies of the demand letters are enclosed.

" 'A lawyer shall not bring or defend a proceeding, or assert or controvert any issue therein, unless there is a basis in law and fact for doing so that is not frivolous . . . .' Rule 3.1, *Rules of Professional Conduct*. Demand is hereby made that the unauthorized and libelous Counterclaim be withdrawn immediately."

"/s/ George E. Mendillo."

[5] Mendillo's claim letter to each of the members of the agency's board of directors stated: "I represent . . . Sowell in connection with the referenced lawsuit. Available records indicate that you are a member of the Board of Directors of [the agency]. . . . On July 31, 2012, I wrote to . . . Tinley, [the agency's] legal counsel, informing him that each member of the [agency's] Board of Directors should know that if the affairs of [the agency] in dissolution were not conducted in accordance with the law, individual [agency] Board members might be held individually and personally liable to . . . Sowell and to other [agency] creditors for unsatisfied claims or unsatisfied judgments against [the agency]. A copy of that letter is enclosed.

"On November 25, 2013 . . . McClay, Chairman of the [agency] Board of Directors, testified at deposition that the insurer of [the agency] Director and Officer liability is defending the Sowell lawsuit under a reservation of rights. This means that the insurance company may decline to pay all or a part of any judgment entered against [the agency] and its Officers and Directors in this matter. McClay testified further that [the agency] has no assets from which a judgment might be satisfied.

"According to McClay, the [agency] Board of Directors has not met since July 2012. Notwithstanding that fact, McClay authorized . . . Tinley to file a Counterclaim by [the agency] against . . . Sowell on October 30, 2013. McClay had no legal authority to file that Counterclaim without proper authorization from the [agency] Board of Directors. In addition, . . . McClay is in a conflicted position vis-á-vis [the agency] in that she is a co-defendant in the lawsuit by Sowell and her interests and the interests of [the agency] in that lawsuit are in conflict. Not only does McClay lack the legal authority to file the Counterclaim on behalf of [the agency], she may not properly cast a vote as a member of the [agency] Board of Directors in any matter pertaining to action to be taken on behalf of the [agency] in the Sowell lawsuit.

"You are hereby advised that the assertions contained in the [agency] Counterclaim against . . . Sowell are false and libelous and made with malice. The Counterclaim was filed to accomplish an unlawful ulterior purpose and is an unlawful abuse of process. The Counterclaim must be withdrawn immediately.

"You are further advised that the immunity from liability of directors and

officers of nonprofit tax exempt organizations does not extend to damage or injury caused by reckless, willful or wanton misconduct. You should consult legal counsel with regard to these claims. Please reply on or before December 13, 2013. If no reply is received by that date legal action will be taken against you individually, without further notice.

"If you have officially resigned as officer and/or director of [the agency] please provide me with written evidence confirming the resignation and that the resignation has been made in compliance with applicable law."

"/s/ George E. Mendillo."

[6] Copies of Mendillo's letter to Tinley and the claim letter to the board of directors were attached to the defendants' memorandum of law.

[7] Article IV of the agency's bylaws provides in relevant part: "3. Powers, Responsibilities and Accountabilities. The corporate business affairs of the corporation shall be managed under the direction of the Board of Directors, except as may be otherwise provided in these Bylaws or the articles of incorporation."

[8] The agency cited the following portion of the official commentary to rule 4.2: "*In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization,* and with any other person whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute and admission on the part of the organization." (Emphasis added.) Rules of Professional Conduct 4.2, commentary.

[9] Sowell deposed McClay on November 25, 2013.

[10] Rule 1.13 of the Rules of Professional Conduct provides in relevant part: "(a) A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents.

"(b) If a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of law . . . that reasonably might be imputed to the organization, and that is likely to result in substantial injury to the organization, then the lawyer shall proceed as is reasonably necessary in the best interest of the organization.

* * *

"(f) In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when the lawyer knows or reasonably should know that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing.

"(g) A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of Rule 1.7. If the organization's consent to the dual representation is required by Rule 1.7, the consent shall be given by an appropriate official of the organization other than the individual who is to be represented, or by the shareholders."

[11] As the transcript of the proceeding in the trial court demonstrates, and as the trial court found, the agency did not wish to have the court sanction Mendillo. Its objective merely was to have the court grant the motion for a protective order; the facts related to the letters Mendillo sent were the basis of the agency's request. During the hearing on the motion for protective order, Mendillo was the person who sought to contest whether he had violated the Rules of Professional Conduct.

By filing the writ of error, Mendillo has forced the trial court's hand to articulate its finding that he violated rule 4.2. When Tinley argued before this court, he iterated that he and the agency's position were not seeking to have Mendillo sanctioned, only that the court's order granting the motion for protective order be affirmed. Mendillo is the party pursuing the question of whether he violated the Rules of Professional Conduct.

[12] After the court granted the agency's motion for protective order, Sowell filed a motion to disqualify judicial authority directed to Judge Sheedy. The court denied the motion to disqualify in a memorandum of decision, stating that after hearing argument by all counsel on the agency's motion for a protective order, "the court found . . . Mendillo's sending of the . . . notice of claim letter to . . . Tinley's client without his knowledge and consent to be a clear violation of rule 4.2 and granted the Emergency Motion for Protective Order prohibiting further unprivileged communication with . . . Tinley's clients."

[13] As noted previously, after the court granted the motion for protective

order, Sowell filed a motion to disqualify the judicial authority. In a memorandum of decision denying the motion to disqualify, the court stated that it previously had found that Mendillo violated rule 4.2 of the Rules of Professional Conduct. Thereafter, Mendillo filed numerous motions for articulation and rectification to which the court responded. In his brief to this court, Mendillo has in minute detail examined every finding or statement of the court. In doing so, he identified discrepancies between the transcript of the hearing on the motion for protective order and the trial court's findings in its articulations.

We carefully have reviewed Mendillo's brief and acknowledge that some of the trial court's findings in its articulations are not supported by the record, e.g., whether the court was informed that McClay was present in the courtroom to testify. We conclude, however, that those findings that do not find support in the record are not material or relevant to the court's conclusion that Mendillo violated rule 4.2. As Sowell stated in her objection to the motion for protective order *the only issue with regard to the protective order "is whether the notice claim letter sent by [Mendillo] to individual members of the [agency's] board of directors, advising them that they will be held personally liable to [her] if the counterclaim filed by [the agency] is not withdrawn, is prohibited by rule 4.2 of the Rules of Professional Conduct."* We, therefore, do not address each instance in which the court made a subsequent factual finding that is at odds with the transcript of the hearing on the motion for protective order.

[14] "The Court: *Before I answer that question, sir, would you agree with me that it is an underlying fact that you sent to . . . McClay a communication, to . . . Tinley at the same time you sent a copy of the same letter to his clients; is that true?*

"Attorney Mendillo: *Yes, it is, Your Honor. . . .*

"The Court: *Is it also true that you did that without permission from . . . Tinley?*

"Attorney Mendillo: *Yes.* But I do not stipulate to, number, Your Honor, that they were his clients.

"The Court: We are by number one. We are on number two.

"Attorney Mendillo: Well, I misspoke when I said yes to number one. I do not stipulate that they were . . . Tinley's client at that time. They may be at the present time, but only if they've retained.

"The Court: Well, were they at the time you sent the letter to them?

"Attorney Mendillo: No, they were not." (Emphasis added.)

[15] The board of directors met on December 10, 2013. The minutes of the meeting state in relevant part: "A motion was made . . . to formally ratify all actions taken by . . . DiCara and . . . McClay to date and to continue said authorization to act on behalf of the Agency in the future until the completion of winding up of its affairs. Passed. Unanimously."